IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | : | CASE NO. 03-62695 |
| | : | |
| iPCS, Inc., | : | CHAPTER 11 |
| | : | |
| Debtor. | : | JUDGE DRAKE |
| | : | |
| IN RE: | : | CASE NO. 03-62696 |
| | : | (Jointly Administered Under Case |
| | : | No. 03-62695) |
| iPCS Wireless, Inc., | : | CHAPTER 11 |
| | : | |
| Debtor. | : | JUDGE DRAKE |
| | : | |
| IN RE: | : | CASE NO. 03-62697 |
| | : | (Jointly Administered Under Case |
| | : | No. 03-62695) |
| iPCS Equipment, Inc., | : | CHAPTER 11 |
| | : | |
| Debtor. | : | JUDGE DRAKE |

## MOTION FOR ORDER APPROVING REJECTION OF
## AT&T COMMUNICATIONS INC. SERVICE AGREEMENT (iPCS WIRELESS)

COME NOW iPCS, Inc. ("iPCS"), iPCS Wireless, Inc. ("iPCS Wireless") and iPCS Equipment, Inc. ("iPCS Equipment") (collectively, iPCS, iPCS Wireless and iPCS Equipment are referred to herein as the "Debtors"), the Debtors and debtors in possession in the above captioned Chapter 11 cases, by and through undersigned counsel, and hereby file this their Motion for Order Approving Rejection of AT&T Communications, Inc. Service Agreement (the "AT&T Rejection Motion"). In support of the AT&T Rejection Motion, the Debtors show the Court as follows:

105376

### Jurisdiction

1. This Court has jurisdiction to consider the AT&T Rejection Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. §157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Introduction and Background

2. On February 23, 2003 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). In accordance with Sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate their businesses as debtors in possession. The above-referenced cases are being jointly administered for procedural purposes only in accordance with Rule 1015 of the Federal Rules of Bankruptcy Procedure.

3. iPCS, Inc. ("iPCS") is a Delaware corporation with its principal place of business located at 233 Peachtree Street NE, Suite 1700, Atlanta, Georgia. iPCS Wireless, Inc. and iPCS Equipment, Inc., which are wholly-owned subsidiaries of iPCS, are Delaware corporations with their principal places of business located at 233 Peachtree Street, NE, Suite 1700, Atlanta, Georgia.

4. iPCS is a wholly-owned subsidiary of AirGate PCS, Inc. ("AirGate"), a publicly traded company. iPCS and AirGate are "affiliates" (each, an "Affiliate") of Sprint PCS, the digital personal communications service business group of Sprint Corporation. Sprint PCS offers subscribers nationwide digital personal communications services ("PCS"), but built, owns and operates only a portion of the nationwide network that supports those services. Through an auction process conducted by the Federal Communications Commission ("FCC"), Sprint PCS

acquired licenses to serve the entire U.S. population. All PCS licenses are granted for 10-year terms if the FCC's construction requirements are met. The licenses are subject to renewal for additional 10-year terms. Sprint PCS built, owns and operates wireless networks in major metropolitan or trading areas. To provide services in less densely populated or basic trading areas, Sprint PCS created its Affiliate program whereby it contracted with companies like iPCS which each undertook to build, maintain and operate networks in particular geographic areas to offer and support Sprint PCS's services. iPCS is the Sprint PCS Affiliate for 37 basic trading areas in portions of the Midwest.

5. iPCS was acquired by AirGate under the terms of a merger agreement dated as of August 28, 2001, which was consummated on November 30, 2001. Following the acquisition, in order to facilitate management, administrative, and other related support services necessary to operate AirGate and iPCS and their respective subsidiaries, AirGate, iPCS, and iPCS Wireless entered into a Services Agreement dated as of January 1, 2002 with AirGate Service Company, Inc. ("Service Co"), a wholly-owned subsidiary of AirGate. Service Co is responsible for overseeing, on a day-to-day basis, the business operations and affairs of AirGate, iPCS and their respective subsidiaries. Under the Services Agreement, costs incurred solely for the benefit of either AirGate or iPCS and their respective subsidiaries are allocated and charged to that party. Costs related to shared services are allocated to AirGate and iPCS on a pro rata basis determined by using a ratio based on the number of subscribers in each party's territory divided by the total number of subscribers in both territories.

6. As a result of pre-petition restructuring negotiations with its lenders and representatives of holders of iPCS' senior discount notes, iPCS retained YMS Management, Inc.

3

105376

on January 27, 2003 to provide it with restructuring management and advisory services. As part of that engagement, Timothy M. Yager was appointed Chief Restructuring Officer of iPCS. Prior to AirGate's acquisition of iPCS, Mr. Yager was the President, CEO and Secretary of iPCS as well as a member of its Board of Directors and held corresponding titles at each of iPCS' subsidiaries. Until his recent resignation, Mr. Yager served as a member of the Board of Directors of AirGate.

7. iPCS Wireless is a party to certain management, service, and licensing agreements with affiliates of Sprint Corporation. Under the management agreement between Sprint and iPCS Wireless' predecessor (the "Sprint Management Agreement"), iPCS Wireless, is granted the exclusive right to market Sprint PCS services in thirty-seven basic trading areas in parts of Illinois, Michigan, Iowa, Nebraska, Wisconsin and Missouri, and Indiana and has the right, and obligation, to construct, operate and maintain a PCS network to support Sprint's licensed spectrum in that service area. This obligation required iPCS to design, construct and manage a "Service Area Network" (as defined in the Sprint Management Agreement"). The Sprint Management Agreement was modified in March 2000 and again in February 2001, to increase the iPCS service area from the original 15 basic trading areas including approximately 2.8 million residents to 37 basic trading areas with approximately 7.4 million residents. In consideration for iPCS' performance the Sprint Management Agreement entitles iPCS Wireless to recover 92% of the "Collected Revenue" (as defined in the Sprint Management Agreement) derived from PCS subscribers located in the iPCS service area. Historically, Sprint has unilaterally calculated the "Collected Revenue" and then has paid 92% of that amount to iPCS on a weekly basis. Pursuant to an Amended and Restated Consent and Agreement dated July 12,

2000 among iPCS Wireless, Sprint PCS and the agent for iPCS Wireless's secured lenders, upon an acceleration of the indebtedness under iPCS Wireless's secured loan facility the portion of Collected Revenues to which iPCS Wireless is entitled increases automatically from 92% to 96%. On February 21, 2003, iPCS Wireless received notice that the indebtedness under its secured loan facility had, in fact, been accelerated by the lenders.

8. Under the Services Agreement between iPCS Wireless and Sprint PCS (the "Sprint Services Agreement"), Sprint PCS provides various back office services at rates established by Sprint PCS, including but not limited to billing, collections, subscriber care, customer retention, activation, credit checks, handset logistics, directory assistance, other features, and roaming clearinghouse administration. Sprint PCS has broad discretion under the Sprint Services Agreement to set the prices for the services it performs for iPCS Wireless.

9. iPCS' business is based entirely on its relationship with Sprint PCS and iPCS is completely dependent upon revenue generated through its relationship with Sprint PCS to service the secured indebtedness and the $300 million aggregate face amount of senior discount notes— the vast majority of which was incurred to finance iPCS' construction of the network in its service area – and to satisfy the other costs associated with its operations. iPCS Wireless is fully drawn and in default under its $130 million secured credit facility (the "Credit Facility") with a syndicate of lenders ("Lenders") for whom Toronto Dominion (TEXAS), Inc. is the administrative agent. As set forth above, the Lenders accelerated the indebtedness under the Credit Facility and such indebtedness is now due and payable.

10. Although the number of subscribers using iPCS' portion of the Sprint PCS network has continued to grow and the related revenue has also increased, iPCS' revenue growth

has been more than offset by the increased costs of acquiring and maintaining subscribers, much of which is the direct result of subscriber pricing and other decisions made and implemented by Sprint PCS. These costs are significant and include, without limitation: costs of service; roaming costs; costs of equipment to operate the network; promotional subsidies and other costs associated with activating new subscriber accounts.

11.    iPCS has been hurt by weakness in the wireless communications industry and the economy generally, but the primary cause of its Chapter 11 filing is Sprint PCS. As has been widely reported in the press, Sprint recently faced its own liquidity crisis and the ratings on its public debt hover near junk bond status. Apparently one of Sprint's chief strategies for extricating itself from its own financial difficulties is to squeeze additional cash from the Affiliates. Sprint may have discretion under the Management Agreement and Services Agreement with iPCS, but that discretion does not permit it to unilaterally withhold funds owed iPCS, setoff disputed amounts or set pricing for services that is commercially unreasonable and entirely inconsistent with the business model upon which its business relationship with iPCS was based. Sprint's discretion under its agreements with iPCS must be exercised in a way that comports with the obligation of good faith and fair dealing that is imposed on every contract. As is detailed in the adversary proceeding filed by the Debtors against Sprint and certain of its affiliates on the Petition Date, Sprint's actions have been so egregious and overreaching that it has made it impossible for the Debtors to service their Credit Facility and senior discount notes. Consequently, iPCS was forced to commence these proceedings to protect its assets while it attempts to restructure its debts and address its disputes with Sprint.

12. iPCS Wireless as successor in interest to Illinois PCS LLC is party to that certain Service Agreement with AT&T Communications, Inc., dated as of June 1999 (the "Service Agreement"), wherein AT&T agreed to provide multiple Illinois inter LATA interstate private line circuits and associated components to iPCS Wireless. A copy of the Service Agreement is attached hereto and incorporated herein by reference as Exhibit "A." The Service Agreement will terminate, pursuant to its terms, on August 1, 2004.

### Relief Requested

13. iPCS Wireless under Section 365(a) of the Bankruptcy Code, requests authorization to reject the Service Agreement as of the date of filing of the AT&T Rejection Motion.

14. iPCS Wireless has determined that the Service Agreement is not necessary to effectuate the business reorganization plan.

### Basis for Relief Requested

15. Since the Petition Date, iPCS Wireless has not utilized AT&T to provide the services contracted for under the Service Agreement. The Service Agreement is not necessary for ongoing business operations and will not contribute to the orderly and efficient reorganization of business and financial affairs. The Service Agreement constitutes a burden upon the iPCS Wireless estate and will needlessly increase administrative costs if not rejected immediately.

16. Section 365 of the Bankruptcy Code provides, in pertinent part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. §365(a). A debtor in possession's right to reject

executory contracts and unexpired leases is a fundamental component of the bankruptcy process as it provides a debtor with a mechanism to eliminate financial burdens to the estate. *In re Hardie*, 100 B.R. 284 (Bankr. E.D.N.C. 1989); *In re Gunter Hotel Assoc.*, 96 B.R. 696 (Bankr. W.D. Tex. 1988).

17.   The decision to reject an executory contract is primarily administrative and should be given great deference by a court subject only to review under the "business judgment" rule. *See Sharon Steel Corp. v. Nat'l Fuel Gas Distr. Corp.*, 872 F.2d 36, 40 (3rd Cir. 1989); *Sundial Asphalt Co., v. V.P.C. Investors Corp.*, 147 B.R. 72 (E.D.N.Y. 1992); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984). The business judgment rule requires the debtor to establish that rejection of the lease will likely benefit the estate. *See Sharon Steel Corp.*, 872 F.2d at 39-40; *In re Kong*, 162 B.R. 86 (Bankr. E.D.N.Y. 1993). Courts universally regard the business judgment rule as a low standard to meet, and therefore, absent a finding of bad faith, will not disturb the decision to reject an executory contract by submitting their own business judgment for that of the debtor. *See In re III Enter., Inc. V*, 163 B.R. 453, 469 (Bankr. E.D. Pa. 1994); *In re Hardie*, 100 B.R. at 287.

18.   Rejection of the Service Agreement is clearly an exercise of the Debtors' sound business judgment. Rejection of the Service Agreement is in the best interest of the Debtors, the estates, and the creditors. The Service Agreement is not necessary and will not contribute to orderly and efficient reorganization of the Debtors' business. Additionally, the Service Agreement is a burden as it is a significant cash drain on the estates. For these reasons, sound business judgment dictates that the Service Agreement be rejected immediately. The Debtors

submit that that standards governing the rejection of Service Agreement under Section 365(a) have been met and rejection of the Leases is appropriate.

19. Notice of the AT&T Rejection Motion has been served on the (a) Office of the United States Trustee for the Northern District of Georgia, (b) counsel for the Lenders, (c) counsel for the Unofficial Committee of Bondholders; (d) the lessors; (e) the Federal Communications Commission; (f) Sprint PCS, (g) the Securities and Exchange Commission; (h) AT&T; (i) counsel for the Official Committee of Unsecured Creditors; and (j) those parties that have requested notice.

WHEREFORE, the Debtors respectfully request that the Court:

    (a) grant the AT&T Rejection Motion and authorize the rejection of the Service Motion effective as of the date of the filing of the AT&T Rejection Motion;

    (b) schedule a hearing on the AT&T Rejection Motion; and

    (c) grant such further relief as the Court deems just and proper.

105376

Respectfully submitted this 25th day of April, 2003.

>LAMBERTH, CIFELLI, STOKES
>& STOUT, P.A.
>Proposed Attorneys for the Debtors
>
>_____/s/  Gregory D. Ellis_____
>James C. Cifelli
>Georgia Bar No. 125750
>Gregory D. Ellis
>Georgia Bar No. 245310
>Laura E. Woodson
>Georgia Bar No. 775310

3343 Peachtree Road, N.E.
East Tower, Suite 550
Atlanta, GA 30326
(404) 262-7373

105376

**EXHIBIT "A" FOLLOWS**

105376

MCN: KB3691-02
INTRASTATE -03

# SERVICE AGREEMENT

This Agreement is by and between **AT&T Communications, Inc.**, acting on behalf of the AT&T entities providing services hereunder ("AT&T"), and Illinois PCS, LLC ("Customer"). The parties mutually agree as follows:

1. **SERVICE.** Customer agrees to acquire, and AT&T agrees to provide: Multiple Illinois interLATA intrastate Private Line circuits and associated components (collectively "Service").

2. **CHARGES.** Customer will pay the following monthly and installation charges for the Service. The monthly charges will be stabilized for the Term of this Agreement.

| Service | Serving Offices | Per Circuit Monthly Charges | Per Circuit Installation Charges* |
|---|---|---|---|
| 1. T45 IOC | BLTNILAT to CCHMPILRA | $ 4,905.00 | $2,800.00 |
| 2. T45 IOC | BLTNILAT to OKBRILOA | $11,742.00 | $2,800.00 |
| 3. T45 IOC | BLTNILAT to PEORILPJ (2) | $ 3,938.00 | $2,800.00 |
| 4. T45 IOC | BLTNILAT to SPFDILSD | $ 6,540.00 | $2,800.00 |
| 5. T45 IOC | BLTNILAT to MTONILXC | $ 8,175.00 | $2,800.00 |
| 6. T45 IOC | BLTNILAT to COVLILCL | $14,814.00 | $2,800.00 |

| Service | Service Component | Per Component Monthly Charges | Per Component Installation Charges* |
|---|---|---|---|
| T1.5 | Local Channel - fixed | $198.00 | $1,900.00 |
| T1.5 | Local Channel - 1+ miles | $27.00 | N/A |

The installation charges for new Service shall be waived provided Customer retains the Service for a period of twelve (12) or more months. The monthly charges will be waived for the following components: AC, ACF, M24, M28. In consideration of the discount(s) contained herein, Customer is ineligible for any additional discounts or promotions on or relative to Service. This Agreement does not guarantee availability of facilities. Should facilities not be available Special Construction charges may apply and would be in addition to the charges shown above for the service requested.

3. **TERM.** This Agreement shall commence on the date last signed by both parties ("Commencement Date") and shall terminate August 1, 2004. All Services acquired hereunder shall be coterminous with this Agreement.

4. **DISCONTINUANCE WITHOUT LIABILITY.** Customer may terminate this Agreement prior to the end of the Term without liability if Service is upgraded to another AT&T service purchased directly from AT&T with a revenue commitment equal to or greater than the remaining total revenue commitment of this Agreement, and with a Term expiring on or after the expiration date of the original Term of this Agreement.

5. **DISCONTINUANCE WITH LIABILITY.** In the event an installed circuit provided in this Agreement is terminated or discontinued prior to the end of the Term, Customer will pay the monthly charges stated in Section 2. above, as follows: 50% for the remaining months (or fraction thereof) in the Term. Subject to the conditions set forth in Section 2., above, Customer may also be required to repay previously waived charges.

6. **BUSINESS TURNDOWN.** In the event of a business turndown beyond the Customer's control with the result that the Customer will be unable to meet its revenue commitments under this Agreement (notwithstanding the Customer's best efforts to avoid such a shortfall), AT&T and the Customer will cooperate in efforts to develop a mutually agreeable alternative to this Agreement that will satisfy the concerns of both parties and comply with all applicable legal and regulatory requirements. Customer must give AT&T written notice of the conditions it believes will require the application of this provision. This provision does not constitute a waiver of any charges incurred by the Customer prior to the time the parties mutually agree to amend or replace this Agreement.

AT&T Proprietary--Use Pursuant to Company Instructions

7. **CONFIDENTIALITY.** Customer understands and agrees that the charges described above are confidential and proprietary to AT&T. Customer further agrees not to disclose, disseminate or publish such confidential and proprietary information, unless required to do so under applicable laws.

8. **OTHER TERMS AND CONDITIONS.** EXCEPT FOR ANY WARRANTIES EXPRESSLY MADE IN THE AT&T TARIFFS, AT&T EXCLUDES ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. AT&T'S LIABILITY TO CUSTOMER IS SUBJECT TO THE LIMITATIONS STATED IN THE AT&T TARIFFS.

9. **GENERAL.** All other meanings, terms and conditions of the applicable AT&T intrastate Private Line Services Tariffs and any other applicable AT&T tariffs are incorporated herein by reference and made an express part of this Agreement. AT&T'S obligation to provide the Service shall be and is subject to any necessary tariffs or tariff revisions becoming or remaining effective. The construction, interpretation and performance of this Agreement shall be construed in accordance with and governed by the laws and regulations of the State of New York. If any provision of this Agreement is held to be invalid or unenforceable, then the remainder of the Agreement shall remain in full force and effect and the parties shall promptly negotiate a replacement or agree that no replacement is necessary. If the parties are unable to reach agreement on such amendment or replacement after such provision is held to be invalid or unenforceable, then this Agreement shall be immediately terminated. Customer shall remain liable for all charges incurred under this Agreement prior to such termination. AT&T shall retain title to all of its equipment and facilities used to provide Service under this Agreement. It is expressly understood and agreed that AT&T shall act as and be deemed to be an independent contractor for purposes of this Agreement. Neither AT&T nor any of its employees shall act as or be deemed to be an agent or employee of Customer, provided, however, Customer may grant AT&T agency powers in writing as agreed upon by both parties. AT&T shall have the sole right to control and directly supervise the method, manner, and details of its work to be performed under this Agreement. Neither party may assign this Agreement without the prior written consent of the other, which consent shall not be unreasonably withheld or delayed, provided, however, that AT&T may assign this Agreement to an affiliate, subsidiary or successor in interest without the consent of Customer, but shall not be relieved of any obligations so assigned. AT&T may assign its rights to receive payment without the consent of Customer.

10. **ENTIRE AGREEMENT.** This is the entire Agreement, along with the above referenced AT&T tariffs, between the parties with respect to the Service provided hereunder and supersedes all prior agreements, proposals or understandings between the parties, whether written or oral.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement in duplicate counterparts, each of which shall be deemed an original but all of which together shall constitute but a single instrument.

YOUR SIGNATURE ACKNOWLEDGES THAT YOU HAVE READ, UNDERSTAND AND AGREE TO THE PROVISIONS OF THIS AGREEMENT AND THAT YOU ARE DULY AUTHORIZED TO SIGN THIS AGREEMENT.

| Customer | AT&T Communications, Inc. |
|---|---|
| Full Legal Name: Illinois PCS, LLC | |
| By: [signature] | By: [signature] |
| (Authorized Customer Signature) | (Authorized AT&T Signature) |
| LYNN PIKE  VP-COO | K. Theresa Hefley  State Ctr Mgr |
| (Typed or Printed Name and Title) | (Typed or Printed Name and Title) |
| Date: 6/15/99 | Date: 6-24-99 |

COPY

## ADDENDUM TO SERVICE AGREEMENT

This Addendum is made by and between AT&T Communications, Inc., acting on behalf of the AT&T entities providing services hereunder ("AT&T"), and the Customer.

WHEREAS, AT&T and Customer entered into a Illinois Service Agreement accepted by AT&T on June 24, 1999;

NOW, THEREFORE, AT&T and Customer agree to amend the Service Agreement as follows:

1. Article 2 (**CHARGES.**) shall be amended to read: "

| Service | Service Component | Per Component Monthly Charges | Per Component Installation Charges |
|---------|-------------------|-------------------------------|------------------------------------|
| T1.5 | Local Chanel – per mile | $18.00 | N/A |

2. Except as modified in this Addendum, all other terms and conditions of the aforementioned Services Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the parties hereto have executed this Addendum in duplicate counterparts, each of which shall be deemed an original but all of which together shall constitute but a single instrument.

---

YOUR SIGNATURE ACKNOWLEDGES THAT YOU HAVE READ, UNDERSTAND AND AGREE TO THE PROVISIONS OF THIS AGREEMENT AND THAT YOU ARE DULY AUTHORIZED TO SIGN THIS AGREEMENT.

---

Customer
Full Legal Name: Illinois PCS, LLC

By: _____
(Authorized Customer Signature)
LYNN PIKE    VP-COO
(Typed or Printed Name and Title)

Date: 8/12/99

AT&T Communications, Inc.

By: _____
(Authorized AT&T Signature)
K. Theresa Hesterley, State Offer Manager
(Typed or Printed Name and Title)

Date:

AT&T Proprietary--Use Pursuant to Company Instructions



# Non-Disclosure Agreement

Customer Name: __Illinois PCS, L.L.C.__ ("Customer")   AT&T

Address: __111 East First Street__   Address: _____

__Geneseo, IL  61254__

American Telephone and Telegraph Company ("AT&T") and you, the Customer, anticipate the need to discuss unannounced products, features and services in order to assist you in making business decisions concerning your needs for these products, features and services. In consideration of the mutual promises contained herein, and as a condition to the disclosure of information, AT&T and you agree as follows:

1. This Agreement shall become effective when accepted in writing by AT&T and shall continue for a period of two (2) years unless sooner terminated in writing by either party. You agree that all of your obligations undertaken herein with respect to Confidential Information received pursuant to this Agreement shall survive and continue after any expiration or termination of this Agreement.

2. AT&T may, during the course of discussions, reveal to you certain confidential, proprietary and/or trade secret information concerning products, features and services some of which may not have been announced and are generally not available. Such information may include, without limitation, certain specifications, designs, plans, drawings, hardware, software, data, prototypes or other business and technical information which relate in whole or in part to processors, office automation products, communications products or services and all related enhancements ("Confidential Information"). All Confidential Information, in whatever form provided, shall remain the property of AT&T.

3. For a period of three (3) years following the date of receipt of Confidential Information, you shall:

A. only disclose such Confidential Information to those of your employees with a need to know and not disclose to third parties except with the prior written approval of AT&T;

B. advise employees who receive the Confidential Information of the existence and terms of this Agreement and of the obligations of confidentiality herein;

C. use and require your employees to use at least the same degree of care to protect the Confidential Information as is used with your proprietary information, with the degree of care, in no event, to be less than holding the Confidential Information in confidence; and

D. use the Confidential Information only for the purpose of assisting you in making business decisions concerning your needs for products, features and services covered by the Confidential Information.

4. Notwithstanding anything to the contrary herein, you shall have no obligation to preserve the confidentiality of any Confidential Information which:

A. prior to any disclosure by AT&T was known to you free of any obligation to keep it confidential as evidenced by documentation in your possession;

B. is or becomes publicly available by other than unauthorized disclosure by you;

C. is developed by or on behalf of you independent of any Confidential Information; or

D. is received from a third party whose disclosure does not violate a confidentiality obligation.

5. Neither this Agreement nor the disclosure or receipt of Confidential Information shall constitute or imply any promise or intention by you to make any purchase of products, features or services, or constitute or imply any promise, intention or commitment by AT&T with respect to the present or future marketing, sale or pricing of the products, features and services. In addition, AT&T has no obligation to furnish you with any Confidential Information.

6. Confidential Information furnished in written, pictorial, magnetic and/or other tangible form shall not be duplicated by you except as necessary for purposes of this Agreement. You shall return all tangible Confidential Information (including copies, reproductions or otherwise containing Confidential Information) within ten (10) business days of AT&T's written request.

7. You agree that you shall not transmit, directly or indirectly, the Confidential Information received from AT&T hereunder, or any portion thereof, to any country outside of the United States.

8. Nothing contained in this Agreement shall be construed as granting or conferring any rights by license or otherwise in any disclosed Confidential Information or under any trademark, patent, copyright (except as provided in Paragraph 6), mask work or any other intellectual property right of AT&T.

9. You agree not to announce or disclose to any third party your participation in discussions with AT&T concerning any unannounced products, features or services or the nature of any such discussions without first securing the prior written approval of AT&T.

YOUR SIGNATURE ACKNOWLEDGES THAT YOU HAVE READ AND UNDERSTAND THE TERMS AND CONDITIONS SET FORTH ABOVE.

__Illinos PCS L.L.C.__ (Customer)

By: __[signature]__ (Authorized Customer Signature)

__Lynn Pike__ (Typed or Printed Name)

__Vice President & COO__ (Title)

__06/15/99__ (Date)

AT&T
Accepted by: _____
(Typed or Printed Name)
_____ (Title)
_____ (Address)
City _____ State _____ Zip _____
(Date)

## **CERTIFICATE OF SERVICE**

This is to certify on the date indicated below, I served a true and correct copy of the foregoing AT&T Rejection Motion upon the party listed below via first class United States mail in a properly addressed envelope to assure delivery, to:

> U.S. Trustee
> Office of the U.S. Trustee
> 362 Richard Russell Building
> 75 Spring Street, SW
> Atlanta, GA  30303

This 25th day of April, 2003.


                /s/ Gregory D. Ellis
                Gregory Ellis

105376